Adam M. Apton (State Bar No. 316506)
**LEVI & KORSINSKY LLP**
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Telephone: 415-373-1671
Facsimile: 212-363-7171
Email: aapton@zlk.com

*Counsel For Plaintiffs*

*[Additional Counsel Listed On Signature Page]*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK GLINOGA, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>SULLIVAN ENTERTAINMENT INC., SULLIVAN HOME ENTERTAINMENT LIMITED, SULLIVAN ENTERTAINMENT INTERNATIONAL INC., and SULLIVAN ENTERTAINMENT GROUP INC.,<br><br>Defendants. | **Case No.: 25CV0707-GPC-SBC**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Mark Glinoga ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against Defendants Sullivan Entertainment Inc., Sullivan Home Entertainment Limited, Sullivan Entertainment International Inc., and Sullivan Entertainment Group Inc. (collectively, "Sullivan Entertainment") d/b/a GazeboTV ("GazeboTV" or "Defendants"). GazeboTV owns and manages a video streaming

website at https://www.gazebotv.com/browse (the "Website"). On the Website, Defendants utilized tracking tools to intercept and disclose consumers' search terms, video watching information, and personally identifiable information (collectively, "Sensitive Information") without seeking or obtaining consumers' consent (the "Tracking Tools"). The Website's use of the Tracking Tools resulted in violations of the Video Privacy Protection Act ("VPPA"), state and federal wiretap statutes, and invasions into consumers' privacy. Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. This is a class action brought on behalf of all persons who subscribed to the Website and subsequently watched pre-recorded video content on the Website.

2. The Website is in the business of the sale of prerecorded audio-visual materials and offers users the option to subscribe to the Website to buy, rent or download digital movies and TV series by providing their email addresses (the "Subscribers").

3. This subscription unlocks access to the Website's collection of digital movies and TV series, exclusive behind-the-scenes content, and special documentaries and interviews.[1]

4. In short, the Website's raison d'etre is providing access to and delivering pre-recorded video content.

---

[1] *How GazeboTV Works*, GAZEBOTV, https://home.gazebotv.com/#:~:text=Browse%20Our%20Library%20%2D%20Explore%20our%20collection%20of%20digital%20movies%20and%20TV%20series (last visited Mar. 26, 2025); *GazeboTV Account*, GAZEBOTV, https://www.gazebotv.com/checkout/subscribe/signup (last visited Mar. 26, 2025).

5. Defendants chose to work with Vimeo, Inc. ("Vimeo") to host their Website and provide the streaming technology for the Website so that Subscribers could digitally access Defendants' video content.

6. Defendants made use of Vimeo's "over the top" ("OTT") platform, which allows video content providers, like Defendants, to "send content over a high-speed internet connection . . . [so] users can access the content they want straight from the creator, without having to through an intermediary . . . ."[2]

***Video Privacy Violations***

7. In all instances, the web watching of videos on the Website is tracked by Defendants as a result of its decision to place the Tracking Tools on each individual page containing video content on the Website.

8. Defendants do not disclose that Subscribers' Sensitive Information, including personally identifiable information ("PII"),[3] would be captured by the Tracking Tools, and then transmitted to third parties.

9. The Website does not inform Subscribers that their Sensitive Information will be exposed, available, and readily usable by any person of ordinary technical skill who receives that data.

10. At no point during or after the subscription sign up process – or anywhere on the Website for that matter – do Defendants seek or obtain consent for the disclosure of Subscribers' Sensitive Information, which Defendants surreptitiously gathered through the use of the Tracking Tools that it chose to employ on the Website.

---

[2] *Create an OTT platform,* VIMEO, https://vimeo.com/ott (last visited Mar. 26, 2025).

[3] 18 U.S.C. § 2710(a)(3) ("includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider").

11. In today's data driven world, a company's data sharing policies for a service or subscription are important factors for individuals to consider in deciding whether to provide personal information to that service or commit to a subscription.

12. Congress has recognized the immediate and irreversible harm caused by associating and disclosing a person's personally identifiable information in conjunction with their video watching information.

13. Congress' enactment of the VPPA, and its continued endorsement of the statute, supports that recognition. The VPPA prohibits video tape service providers,[4] such as Defendants, from sharing Subscribers' PII tied to the title, description, or subject matter of pre-recorded audio video material[5] without valid consent.[6]

14. Congress made clear that the harm to individuals impacted by VPPA violations occurs the moment, and each time, a consumer's information is shared.

15. Defendants purposefully implemented and utilized Meta, Inc.'s ("Facebook" or "Meta") tracking pixel (the "Pixel," discussed and defined herein) to track Subscribers' activity on the Website and disclose that information, including Subscribers' PII, to Facebook to gather valuable marketing data. The Pixel could not be placed on the Website without steps taken directly by or on behalf of Defendants.

16. Because of GazeboTV's decision to employ the Pixel and because it chose to employ the Pixel on webpages containing video content on the Website, a Subscriber's PII is shared the moment the Subscriber requests video materials.[7]

---

[4] 18 U.S.C. § 2710(a)(4).

[5] 18 U.S.C. § 2710(b)(2)(D)(II).

[6] 18 U.S.C. § 2710.

[7] As defined by the VPPA, protected "personally identifiable information" includes information which identifies a person as having "*requested* or obtained" video materials. *See* 18 U.S.C. § 2710(a)(3). When a website user clicks a link leading to

17. Defendants do not seek and have not obtained consent from Subscribers to utilize the Pixel to track, share, and exchange their Sensitive Information, including their PII, with Facebook.

18. Subscribers of the Website have been harmed as a result of Defendants' violations of the VPPA. In addition to monetary damages, Plaintiff seeks injunctive relief requiring Defendants to immediately (i) remove the Pixel from the Website, or (ii) add adequate notices and obtain the appropriate consent from Subscribers.[8]

***Wiretap Violations***

19. Federal and state legislatures addressed citizens' privacy expectations when communicating with parties over wired communications.

20. Congress passed the Federal Wiretap Act, which prohibits the unauthorized interception of electronic communications.

21. California passed the California Invasion of Privacy Act ("CIPA"), which attaches liability to any person who, willfully and without the consent of all parties to a communication, attempts to read or to learn the contents or meaning of

---

a video, the user "requests" authorization to access the material from the website's server and, if authorized, the server then sends the data to the user. *See How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Mar. 26, 2025).

[8] Website owners like GazeboTV also have the option to anonymize the video's title within the URL or encrypt the video title using hashing, as described by Facebook. *See Advanced Matching*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching#security (last visited Mar. 26, 2025); *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools (last visited Mar. 26, 2025) ("When using a Meta image pixel or other Meta Business Tools, you or your service provider must hash [personally identifiable information] in a manner specified by us before transmission.").

any message or communication while it is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within California.[9]

22. CIPA also prohibits the installation of a "pen register or a trap and trace device without first obtaining a court order . . . ."[10]

23. Defendants purposefully implemented and utilized the Pixel and other Tracking Tools to intercept and read Subscribers' search terms and disclose the location and content of webpages visited by Subscribers. The Website does not provide notice of or obtain consent as to such practices.

24. Subscribers of the Website, such as Plaintiff, have an interest in maintaining control over their Sensitive Information, as well as an interest in preventing their misuse.

25. Subscribers of the Website have been harmed by Defendants, resulting in violations of the Federal Wiretap Act and CIPA. In addition to monetary damages, Plaintiff seeks injunctive relief requiring Defendants to immediately (i) remove the Tracking Tools from the Website, or (ii) add, and obtain, appropriate consent from Subscribers.

26. Plaintiff's claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiff seeks relief in this action individually and on behalf of Subscribers of the Website for violations of the VPPA, 18 U.S.C. § 2710; violations of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e); and violations of CIPA, Cal. Penal Code § 631 & 638.

## PARTIES

27. Plaintiff Mark Glinoga is, and has been at all relevant times, a citizen of California who resides in Los Angeles, California. Plaintiff Glinoga used

---

[9] Cal. Penal Code § 631(a).

[10] Cal. Penal Code § 638.51.

Defendants' Website to access video content, especially historical content. By interacting with Defendants' Website, Plaintiff Glinoga's Sensitive Information was disclosed to third parties, including Meta, through Defendants' placement of Tracking Tools, including the Pixel, on the webpages he visited on Defendants' Website. These webpages include but are not limited to the webpages for the search engine, the specific videos he watched, and the webpage through which Plaintiff Glinoga subscribed to the Website. The Sensitive Information disclosed to third parties included but is not limited to Plaintiff Glinoga's search terms, the titles or descriptions of videos he watched, and his unique Facebook ID. Plaintiff Glinoga had an active Facebook account at the time of his interactions with Defendants' Website. Shortly after visiting the Website to view video content, Plaintiff Glinoga began to receive unsolicited advertisements relating to the videos he watched. Plaintiff Glinoga saw nothing on the Website that suggested to him that his Sensitive Information would be disclosed to unauthorized third parties and did not authorize, consent to, or otherwise engage or permit the disclosure of his Sensitive Information to Meta or any third party. Plaintiff Glinoga would not have used the Website to access video content had he known that his Sensitive Information would be disclosed to unauthorized third parties.

28. Defendants Sullivan Entertainment d/b/a GazeboTV, having its registered address at 110 Davenport Road Toronto, Ontario M5R 3R3 Canada, has been in the business of writing, producing, and directing films and television series for over thirty years.[11] GazeboTV is the home for classic movies and series from Sullivan Entertainment, including the original Anne of Green Gables and spin-off Road to Avonlea,[12] that focuses on digital content and direct-to-consumer services.

---

[11] *About*, SULLIVAN ENTERTAINMENT, https://www.sullivanmovies.com/ (last visited Mar. 26, 2025).

[12] *How GazeboTV Works,* GAZEBOTV, https://home.gazebotv.com/ (last visited Mar. 26, 2025).

Defendants own and operate GazeboTV, which offers service to buy or rent live and on-demand digital movies and TV series, including a collection of DVDs & Blu-ray Collections.

## JURISDICTION AND VENUE

29. The District Court for the Southern District of California has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Video Privacy Protection Act, 18 U.S.C. § 2710, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e).

30. This Court has personal jurisdiction over Defendants because Defendants derive revenue in the State of California, including Defendants' revenue generated from its management over the Website, including the revenue sharing, advertising sales, etc. that Defendants derive from the Website.

31. Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b)(3).

## COMMON FACTUAL ALLEGATIONS

### I. Legislative Background

#### A. The Video Privacy Protection Act

32. The VPPA's story begins in 1988, a Washington-based newspaper published a profile of Supreme Court nominee, Judge Robert H. Bork based on the titles of films his family had rented from a video store. Senators took to the floor to denounce the act, with Senator Patrick Leahy noting that:

> In an era of interactive television cables, the growth of computer checking and check-out counters . . . all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch . . . I think it is something that we

have to guard against.

S. Rep. 100-599, at 5-6.

33. Congress believed that these “information pools” created privacy interests that directly affected the ability of people to freely express their opinions, join in association with others, or enjoy the general freedoms and independence protected by the Constitution. *Id.* at 7.

34. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer “a window into our loves, likes, and dislikes,” such that “the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance.” *Id.* at 7-8 (statements of Sens. Simon and Leahy, respectively).

35. Senator Simon lamented that “[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes.” *Id.* at 6-7.

36. As a result, Senate Bill 2361 was drafted to “give meaning to, and thus enhance, the concept of privacy for individuals in their daily lives” by prohibiting “unauthorized disclosures of personal information held by video tape providers.” *Id.* at 6.

37. The VPPA regulates the disclosure of information about consumers’ consumption of video content, imposing specific requirements to obtain consumers’ consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney’s fees.

38. The statutory damages were deemed “necessary to remedy the intangible harm caused by privacy intrusions.” *Id.* at 8.

39. In 2012, Congress amended the VPPA, and in so doing, reiterated the Act’s applicability to “so-called ‘on-demand’ cable services and Internet streaming

services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

40. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[13]

41. This application of the VPPA to modern video sources, such as websites, has been confirmed by various courts across the country.[14]

42. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

43. The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

44. Congress wanted to ensure that any transaction between consumer and VTSP involving a request or procurement of specific video materials or video

---

[13] *See Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, *available at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited Mar. 26, 2025).

[14] *See, e.g., Sellers v. Bleacher Report, Inc.*, 2023 U.S. Dist. LEXIS 131579, at *15-18 (N.D. Cal. July 29, 2023) (VPPA sufficiently applied to sports news website); *Jackson v. Fandom, Inc.*, 2023 U.S. Dist. LEXIS 125531, at *6 (N.D. Cal. July 20, 2023) (VPPA applies to gaming and entertainment website); *Louth v. NFL*, 2022 U.S. Dist. LEXIS 163706, at *11-12 (D.R.I. Sep. 12, 2022) (holding VPPA applied to NFL's videos accessible through mobile app).

services would be protected. In short, the language is broad enough to encompass digital as well as physical transactions, so long as the transaction includes the defined and prohibited information.

45. A video tape service provider ("VTSP") is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

46. Courts have interpreted the VPPA's definition for VTSPs broadly. VTSPs are not required to deal exclusively in audio visual content; rather, audiovisual content need only be part of the provider's book of business. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 547-48 (2d Cir. 2024).

47. Consumer is defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1). The broad language defining consumer comports with the initial purpose of the VPPA.

48. In interpreting the definitions of the VPPA, the *Salazar* Court also reasoned that 'consumer' should be understood to encompass a renter, purchaser, or subscriber of *any* of the provider's 'goods or services'—audiovisual or not. *Salazar*, 118 F.4th at 548-49.

49. Defendants here are video service providers as they provided pre-recorded audio-visual materials to Plaintiff and Class Members on their Website.

50. The relationship between Plaintiff and Defendants is precisely the type of relationship contemplated by the VPPA.

51. In this case, Plaintiff's PII was knowingly and systematically disclosed to Facebook, without obtaining their consent.

**B. The Federal Wiretap Act**

52. The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[15]

53. The Wiretap Act primarily concerned the government's use of wiretaps but Congress grew concerned that technological advancements like "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" were rendering the Wiretap Act out of date.[16] Thus, in 1986, Congress amended the Wiretap Act through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[17]

54. The ECPA primarily focused on two types of computer services that were prominent in the 1980s: (i) electronic communications like email between users; and (ii) remote computing services like cloud storage or third-party processing of data and files.[18]

55. Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication; (iii) while the communication is being transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

56. While the ECPA allows a single party to consent to the interception of an electronic communication, single party consent is only acceptable where the

---

[15] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).

[16] Senate Rep. No. 99-541, at 2 (1986).

[17] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).

[18] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).

communication is not "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. §2511(2)(d).

57. While communicating with Defendants on the Website through their viewing choices, Subscribers had the contents[19] of their communications with Defendants intercepted by third parties via the Tracking Tools.

58. Defendants purposefully included the Tracking Tools on the Website to intercept Plaintiff's communications and redirect them to third parties to improve the effectiveness of its advertising and marketing.

59. Plaintiff did not know of or consent to the exposure of his legally protected communications with Defendants to third parties.

**C. The California Invasion of Privacy Act**

60. CIPA was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[20] The California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[21]

61. CIPA is regularly recognized as California's analog to the Federal Wiretap Act, comprised of the same general elements and protect against the same general harms.

---

[19] The contents of Plaintiff's and users' communications include: 1) search terms submitted to the site; 2) the location and contents of webpages visited by users; and, 3) the PII discussed in Section III(A).

[20] Cal. Penal Code § 630.

[21] *Id.*

62. To protect people's privacy, legislators broadly protected wired and aural communications being sent to or received from California.[22] Notably, for wired communications, California set out to prohibit (i) intentional wiretapping or (ii) willful attempts to learn the contents of wired communications, (iii) attempts to use or transmit information obtained through wiretapping, or (vi) aiding, agreeing with, employing, or conspiring with any person(s) to unlawfully do, permit, or cause the preceding three wrongs.[23]

63. CIPA also prohibits the installation of a "pen register" or a "trap and trace device" without first obtaining a court order.[24]

## II. <u>Defendants Control The Website</u>

### A. GazeboTV Owns and Manages the Website

64. GazeboTV maintained control over the Website.

65. While Vimeo provided the underlying technology for the Website and video streaming services, GazeboTV maintained control over the relevant portions of the Website. GazeboTV's ownership of the Website is reflected in its Privacy Policy: "This is the Privacy Policy of GazeboTV (hereafter referred to as "us" or "we"). This Privacy Policy describes how your personal information is collected, used, and shared when you use our streaming service, GazeboTV through our website (www.gazebotv.com) or any of our branded apps (together, the "Service")."[25]

66. GazeboTV's management and control does not end there. The Privacy Policy also states: "For more information about our privacy practices, if you have

---

[22] Cal. Penal Code § 631-32.

[23] *Mastel v.Miniclip SA,* 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).

[24] Cal. Penal Code § 638.51.

[25] *Privacy Policy*, GAZEBOTV, https://www.gazebotv.com/privacy#:~:text=This%20is%20the,the%20%E2%80%9CService%E2%80%9D (last visited Mar. 26, 2025).

questions, or if you would like to make a complaint, please contact us by using our form or by mail using the details provided below: Sullivan Entertainment (d/b/a GazeboTV) 110 Davenport Road Toronto, Ontario M5R 3R3 Canada"[26]

### B. GazeboTV Manages the Relevant Portions of the Website

67. OTT website owners have control over and choose which videos to upload and make available to their Subscribers.[27]

68. OTT website owners also have control over how subscriptions work, including which videos are unlocked by subscriptions and become deliverable to Subscribers.[28]

69. Vimeo provides instructions to OTT website owners, like Defendants, on how to add metadata to help users discover new and relevant video content or otherwise search within the OTT website to find videos to watch.[29]

70. Vimeo recommends, for example, naming videos to improve search engine optimization.[30]

71. Vimeo establishes that when a video is added to an OTT website by its owner or operator, the video is named after the digital file uploaded by default.[31]

---

[26] *Id.*

[27] *See Uploading videos on Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12426966892561-Uploading-videos-on-Vimeo-OTT (last visited Mar. 26, 2025).

[28] *See Creating and Editing a Subscription*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427127095441-Creating-and-editing-a-subscription-product-on-Vimeo-OTT (last visited Mar. 26, 2025).

[29] *See Add metadata to my Vimeo OTT videos for discovery*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427018284945-Add-metadata-to-your-Vimeo-OTT-videos-for-discovery (last visited Mar. 26, 2025).

[30] *See Optimize your Vimeo OTT site for search engines (SEO)*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12426994162961-Optimize-your-Vimeo-OTT-site-for-search-engines-SEO (last visited Mar. 26, 2025).

[31] *Id.*

72. The responsibility for providing clear titles to videos falls to the OTT website owner, which in turn, is used "to form the URL where the video lives."[32]

73. OTT website owners are given an additional opportunity to "rename a video or collection . . . URL [to] something relevant . . . ."[33]

74. OTT website owners must take affirmative steps to add detailed URLs to their OTT websites.

75. Defendants undertook these steps. GazeboTV added detailed URLs to the Website.

76. Vimeo gives OTT website owners the ability to add metadata to their videos "so that [their] customers can easily discover related content they might enjoy. It also allows [OTT website owners] to make it easier for viewers to find [OTT website owners'] content via search or other parameters."[34]

77. The metadata added to videos by OTT website owners can include: information about the video, like content tags that "describes the specific video"; genres; cast; crew; release date; ratings; advisories, if the video contains offending content; and advanced or custom metadata created by the OTT website owners.

78. OTT website owners must take affirmative steps to add metadata to their OTT websites.

79. GazeboTV undertook these steps. GazeboTV added metadata to the Website.

80. Vimeo informs OTT website owners – those which provide content to stream on Vimeo's OTT platforms – that Vimeo merely provides support for OTT

---

[32] *Id.*

[33] *Id.*

[34] *Add metadata to my Vimeo OTT videos for discovery*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427018284945-Add-metadata-to-your-Vimeo-OTT-videos-for-discovery (last visited Mar. 26, 2025).

website owners "adding conversion tracking Pixels from services like Facebook, X (formerly Twitter), or Adwords . . ."[35]

81. Vimeo explains that "[a] pixel tracks certain events (like when someone makes a purchase through your site, etc.); when the events you're tracking are triggered, the pixel sends the data over to your analytics."[36]

82. Vimeo adds that after an OTT website owner installs a tracking pixel on their OTT website, the intercepted data is viewable on the OTT website owner's account with each pixel's platform.[37]

83. Vimeo then provides instructions to OTT website owners, like GazeboTV, on how to add the Pixel to their OTT Websites. OTT website owners choose whether to add tracking tools, like the Pixel, to the Vimeo-associated websites.

84. To do so, OTT website owners must first create a Pixel on Facebook's platform; and add that Pixel ID to Vimeo's tracking integration.[38] Then, the OTT website owner must attach the tracking pixel to their Associated Product in their OTT website (or otherwise select "All Products").[39] Finally, the OTT website owner must save these settings.

85. Vimeo advises OTT website owners that the Pixel tracks the following events by default: PageView, InitiateCheckout, Purchase, and Complete Registration.[40]

---

[35] *Add tracking pixels to your Vimeo OTT checkout page*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427502043409-Add-tracking-pixels-to-your-Vimeo-OTT-checkout-page (last visited Mar. 26, 2025).
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*

86. GazeboTV undertook the steps necessary to add the Pixel to their Website. GazeboTV also made use of the Pixel SubscribedButtonClick event. GazeboTV did not accept the default events. Instead, GazeboTV programmed the Pixel to collect additional information when subscribers click specific buttons, such as to request videos. *See* Section III(A).

87. GazeboTV controlled its Privacy Policy and cookie notifications on the Website.

88. While Vimeo provides a "simple cookie consent banner" for OTT websites, Vimeo informs OTT website owners that "[c]ertain sites may be subject to further regulations depending on their purpose, content, and user base. It is up to the site owner to determine if a site requires a more robust cookie consent banner."[41]

89. For those that want more robust cookie consent banners, OTT website owners are offered a chance to integrate "with a third-party solution to ensure legal compliance."[42]

90. Similarly, "[a]s the operator of [its] streaming service, [OTT website owners, like GazeboTV,] must provide [their] users with a transparent notice of how [they] handle[] their personal information, commonly known as a 'privacy policy.'"[43]

91. Vimeo provides OTT website owners with a "template that already includes the most common points of collection and uses of data for OTT streaming services." Vimeo makes clear, however, that it "makes no representation about the sufficiency or legality of the templated privacy policy" and that OTT website

---

[41] *Setting up my Vimeo OTT site's cookie consent banner*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12426990708241-Setting-up-your-Vimeo-OTT-site-s-cookie-consent-banner (last visited Mar. 26, 2025).

[42] *Id.*

[43] *Creating a Privacy Policy for your Vimeo OTT* site, VIMEO, https://help.vimeo.com/hc/en-us/articles/12426965771665-Creating-a-Privacy-Policy-for-your-Vimeo-OTT-site (last visited Mar. 26, 2025).

owners "should change the default languages depending on [their] uses of data, additional collection points, and the laws to which [their] organization[s] may be subject."[44]

92. Thus, GazeboTV was responsible for notifying Subscribers, and obtaining their consent, yet failed to do so in accordance with the VPPA and other federal and state laws.

## III. The Website and the Tracking Tools

93. On the Website, Defendants utilized Tracking Tools, including those created by Facebook, Google, and Vimeo (collectively, the "Tracking Entities"), to intercept and disclose Subscribers' Sensitive Information without seeking or obtaining Subscribers' consent.

### A. The Facebook Pixel

94. Facebook offers the Pixel to web developers for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

95. The Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[45]

96. As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[46]

---

[44] *Id.*

[45] *Set up and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Mar. 26, 2025).

[46] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Mar. 26, 2025) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

97. Here, as discussed in Section II(B), Defendants took steps to add the Pixel to the Website via the Vimeo platform.

98. The Pixel is employed by GazeboTV to gather, collect, and then share user information with Facebook.[47] Receiving this information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[48] The disclosure of Subscribers' Sensitive Information benefits GazeboTV by improving the effectiveness of advertising targeted at GazeboTV Subscribers. Studies have shown that personalization in digital marketing through targeted and dynamic advertising can boost revenue by 15%.[49]

99. Website owners and operators can choose to use the Pixel to share both user activity (including video watching activity) and user identity with Facebook. Here, the Website shares both.

100. The harvested data can improve advertising by pinpointing audience demographics by interests, gender, or location and finding the people who are most likely to take action and view content.[50]

101. The Sensitive Information GazeboTV procures Meta to harvest from GazeboTV's Website Subscribers through the Pixel provides similar, if not more,

---

[47] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Mar. 26, 2025).

[48] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Mar. 26, 2025).

[49] Wilson Lau, *What is Targeted Advertising?*, ADROLL BLOG (June 30, 2024), https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Benefits%20of%20Targeted%20Advertising,-1.%20Deliver%20a%20higher (last visited Mar. 26, 2025).

[50] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Mar. 26, 2025).

data, including the titles of videos, whether through search terms, webpage URLs, parameters, or metadata, in addition to their Facebook profile data.

102. The owner or operator of a website holds the decision-making authority over the placement of the Pixel on its site, as well as whether or not any of the data within the Pixel transmission should be "hashed" (a form of encryption).

***1. Defendants Implemented the Facebook Pixel on the Website***

103. To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where adding the Pixel to the website owner's "business portfolio" provides the most utility for using the Pixel.[51] For instance, business portfolios can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Pages, Instagram accounts, ad accounts, and catalogs from a centralized interface, (iii) access and manage multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) post or analyze data analytics collected from Facebook pages or Instagram accounts, (v) run ads businesses across Facebook and Instagram, and (vi) create and manage shops across Facebook and Instagram.[52]

104. To add an operational Pixel to a website, the website owner or operator must take several affirmative steps, including naming the Pixel during the creation and setup of the Pixel.[53]

---

[51] *How to set up your Meta Pixel with a business portfolio*, FACEBOOK, https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited Mar. 26, 2025).

[52] *About business portfolios*, FACEBOOK, https://www.facebook.com/business/help/486932075688253 (last visited Mar. 26, 2025).

[53] *Id.*; *see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE (Feb. 4, 2022) https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited Mar. 26, 2025).

105. Once the Pixel is created, the website operator assigns access to the Pixel to specific people for management purposes,[54] and must connect the Pixel to a Facebook Ad account.[55]

106. To add the Pixel to its OTT website, the website operator must follow the instructions provided by Vimeo discussed, *supra*, in Section II(B).

107. After following these steps, a website operator can start capturing and sharing information using the Pixel.

108. A Pixel cannot be placed on a website by a third-party. It must be placed directly by or on behalf of the site owner. GazeboTV did so.

***2. The Pixel as a Tracking Tool***

109. Once the Pixel is set and activated, it can begin collecting and sharing user activity data as instructed by the website owner.

110. When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the datr cookie, and the fr cookie, all of which allow Facebook to link video watching behavior it receives to the Facebook user watching the video, are automatically created and stored on the user's device. [56]

111. The c_user cookie contains a user's non-encrypted Facebook User ID number ("UID")[57] and has a life span of 365 days.

---

[54] *Add people to your Meta Pixel in Meta Business Suite or Business Manager*, FACEBOOK, https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited Mar. 26, 2025).

[55] *Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/622772416185967 (last visited Mar. 26, 2025).

[56] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Mar. 26, 2025).

[57] *Cookie Policy*, BMW, https://bavarianmotorcars.com/en/cookie-policy (last visited Mar. 26, 2025); *Common cookies and uses*, FACEBOOK,

112. The datr cookie contains "a unique identifier for [a user's] browser . . . [and] has a lifespan of two years."[58]

113. The fr cookie contains an encrypted Facebook user ID and browser ID, and has a lifetime of 90 days on a user's device.[59]

114. This means that for Subscribers to the Website who are also Facebook users, their PII is certain to be shared. Their PII is automatically bundled with their web watching history and disclosed to Facebook when visiting a page with an active Pixel, including the home page.

115. The recipient of the Pixel's transmissions receives the information in a clear and easy to understand manner. The seemingly complex data, such as the long URLs included in the Pixel's transmission, is "parsed," or translated into an easier to read format, such that the information is legible.

116. For example, an embedded URL in a Pixel HTTP Request may look like an indecipherable code, as depicted below (next page):

---

https://www.facebook.com/privacy/policies/cookies/?annotations[0]=explanation%2F1_common_cookies_and_uses (last visited Mar. 26, 2025).

[58] *Security, site and product integrity*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/version/cookie_policy_2022/?subpage=subpage-1.2 (last visited Mar. 26, 2025).

[59] *See Cookie Policy*, BMW, https://bavarianmotorcars.com/en/cookie-policy (last visited Mar. 26, 2025); *Advertising, recommendations, insights and measurement*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 (last visited Mar. 26, 2025).




*Figure 1 - Sample Pixel Request URL*

117. However, these URLs are designed to be "parsed" into easy-to-digest pieces of information, as depicted below:




*Figure 2 - Parsed URL Information from Sample Pixel Request*

118. Similarly, the cookies attached to the Pixel's transmissions appear as a dense, albeit much less so, wall of text, as depicted below:


Cookie: sb=sATZYyHbM_JpCBYKkdn1MuNp; datr=BaboZWMvTk7pLVQuOSysd0td; ps_n=1; c_user=[redacted] dpr=1.25; xs=36%3ARePAVeAN1BpRWg%3A2%3A1732247914%3A-1%3A8146%3A%3AAcUU-dUpK53hiwCJsPoU9Yrw7WxCVswlbsrDGBhaNV8; fr=1ezsvxCKyjLhGuZJJ.AWVHz0ymcoP2chm9h6Z50Tk-Vy8.BnZZQx..AAA.0.0.BnZZTa.AWVtj6gPXwQ; ar_debug=1

*Figure 3- Cookie Data from Sample Pixel Request (c_user redacted)*

119. However, like the URL data, the cookie data is easily parsed into more digestible format, as depicted below:


Headers Payload Preview Response Initiator Timing Cookies

**Request Cookies** show filtered out request cookies

| Name | Value | Do... | Path | Expi... | Size | Htt... | Sec... | Sam... | Part... | Cro... | Prio... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ar_debug | 1 | .fac... | / | Sess... | 9 | ✓ | ✓ | None | | | Med... |
| c_user | [redacted] | .fac... | / | 202... | 21 | | ✓ | None | | | Med... |
| datr | BaboZWMvTk7pLVQuOSysd0td | .fac... | / | 202... | 28 | ✓ | ✓ | None | | | Med... |
| dpr | 0.25 | .fac... | / | 202... | 7 | | ✓ | None | | | Med... |
| fr | 1UbsDFLVRpizv9UfO.AWWVxPCgz... | .fac... | / | 202... | 82 | ✓ | ✓ | None | | | Med... |
| ps_n | 1 | .fac... | / | 202... | 5 | ✓ | ✓ | None | | | Med... |
| sb | sATZYyHbM_JpCBYKkdn1MuNp | .fac... | / | 202... | 26 | ✓ | ✓ | None | | | Med... |
| xs | 36%3ARePAVeAN1BpRWg%3A2%... | .fac... | / | 202... | 99 | ✓ | ✓ | None | | | Med... |

*Figure 4 - Parsed Cookie Data from Sample Pixel Request (c_user redacted)*

120. The c_user cookie can be used by anyone who receives the Pixel transmission to easily identify a Facebook user.

121. A c_user cookie contains a series of numbers (the UID) used to identify a specific profile, as depicted below:




*Figure 5 - Sample UID number of test account created by Plaintiff's counsel to investigate the Pixel, captured by a Pixel event*

122. The information contained within the c_user cookie is considered PII. It contains "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."[60] Because the UID can

---

[60] *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 290 (3d Cir. 2016).

simply and easily be appended to "www.facebook.com/" to navigate to the relevant user's profile, it requires no special skill or expertise to identify the user associated with the UID, and courts have regularly upheld its status as PII.[61]

123. Any person, even without in-depth technical expertise, can utilize the UID to identify owners of the UID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID. Using the UID from *Figure 5*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below (next page):

[61] *See Lebakken v. WebMD, LLC* 2022 U.S. Dist. LEXIS 201010, at *11-12 (N.D. Ga. Nov. 4, 2022); *Czarnionka v. Epoch Times Ass'n*, 2022 U.S. Dist. LEXIS 209067, at *8-10 (S.D.N.Y. Nov. 17, 2022); *Ambrose v. Boston Globe Media Partners, LLC*, 2022 U.S. Dist. LEXIS 168403, at *5-6 (D. Mass. Sept. 19, 2022).




*Figure 6 - Appending UID of a user to "facebook.com/" results in the user being redirected to the user's profile*

124. Importantly, some Facebook profile information – name, gender, profile photo, cover photo, username, user ID (account number), age range, language, and country – are "always public."[62] No privacy setting on Facebook would allow Plaintiff, or any user, to hide this basic information. By compelling a visitor's browser to disclose the c_user cookie alongside event data for media content, GazeboTV knowingly discloses information sufficiently permitting an ordinary person to identify an individual.

---

[62] *Control who can see what you share on Facebook*, FACEBOOK, https://www.facebook.com/help/1297502253597210 (last visited Jan. 14, 2025).

### 3. *The Pixel Shares Consumers' PII*

125. The Pixel tracks user-activity on web pages by monitoring events,[63] which when triggered, causes the Pixel to automatically send data – here, Subscribers' PII – directly to Facebook.[64] Examples of events utilized by websites include: (i) a user loading a page with a Pixel installed (the "PageView event") [65]; (ii) when pre-designated buttons, like the "Watch" button, are clicked (the "SubscribedButtonClick" event)[66]; and (iii) when a user clicks on a checkout button (the "InitiateCheckout" event, collectively with PageView event and SubscribedButtonClick event, the "Pixel Events").[67] The Website utilizes all three Pixel Events.[68]

126. When a Pixel Event is triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[69] This confirms that the Pixel Events sent data to Facebook.

---

[63] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Mar. 26, 2025).

[64] *See generally id.*

[65] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Mar. 26, 2025).

[66] *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Mar. 26, 2025).

[67] *Id.*

[68] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Mar. 26, 2025).

[69] *How We Built a Meta Pixel Inspector*, THE MARKUP (Apr. 28, 2022 8:00 AM), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited Mar. 26, 2025).

127. The HTTP Request includes a Request URL and embedded cookies such as the c_user cookie. It may also include information in its Payload,[70] such as metadata tags.

128. A Request URL, in addition to a domain name and path, contains parameters. Parameters are values added to a URL to transmit data and direct a web server to provide additional context-sensitive services, as depicted below:




*Figure 7 – Mozilla's diagram of a URL, including parameters*[71]

129. Defendants use the Pixel as a Tracking Tool to allow Facebook to intercept Subscribers' non-anonymized PII. Defendants do not disclose its data sharing practices or obtain permission from its Subscribers to disclose their PII to Facebook.

130. Defendants disclose non-anonymized PII and web watching history containing video titles with Facebook. Defendants' disclosures include unique identifiers (the UID) that correspond to specific Facebook users. The recipient finds the UID in a single data transmission which is easily readable by an ordinary person once the PII is packaged and delivered by the Website's Pixel.

131. Defendants monetized the Website's Subscribers by gathering Subscribers' PII and disclosing that valuable information to Facebook in a format

[70] The "request payload" (or more simply, "Payload") is data sent by a HTTP Request, normally through a POST or PUT request, where the HTTP Request has a distinct message body. Payloads typically transmit form data, image data, and programming data. *See Request Payload Variation,* SITESPECT, https://doc.sitespect.com/knowledge/request-payload-trigger (last visited Mar. 26, 2025).

[71] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Mar. 26, 2025).

which allows it to make a direct connection between the identity of a Subscriber and that Subscriber's PII, without the consent of its Subscribers and to the detriment of Subscribers' legally protected privacy rights.

132. Meta independently benefits from the data collected through the Pixel by using Subscribers' PII to sell targeted advertising services. Through the use of Subscribers' PII, Meta refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

133. Defendants had and continue to have the choice to design the Website so that the webpage URLs did not include the titles of videos. Defendants had, and have, the choice as to whether to purposefully include more information in the Website's URLs, including to improve website interaction and search engine optimization.[72] Here, GazeboTV chose to expose Subscribers' video information so that it could benefit from the tracking and disclosing of Subscribers' PII.

134. Defendants also had the power to implement the Pixel in a way that shielded Subscribers' PII. GazeboTV chose, however, to transmit Subscribers' unencrypted PII.[73]

135. These factual allegations are corroborated by publicly available evidence. To illustrate, a hypothetical Subscriber visits the Website, clicks on a pre-recorded video, such as "Wind at My Back: Behind The Scenes,"[74] and subsequently watches the video.

---

[72] *See* Chima Mmeje, *Domains,* MOZ (Nov. 11, 2024), https://moz.com/learn/seo/domain (last visited Mar. 26, 2025).

[73] *See Advanced Matching*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching (last visited Mar. 26, 2025).

[74] *Wind at My Back: Behind The Scenes*, GAZEBOTV, https://www.gazebotv.com/wind-at-my-back-behind-the-scenes (last visited Mar. 26, 2025).

136. The act of loading a webpage with video content triggers a Pixel Event (the PageView event), which records the Subscriber's activity. If the Subscriber watches the video, the SubscribedButtonClick event is triggered, relaying additional data to Facebook about the video the Subscriber watched. Lastly, if the Subscriber chooses to purchase the video, the InitiateCheckout event triggers. See *Figures 8* through *11*, below.

137. Sensitive data sent to Facebook through the triggered Pixel Event are included within the parameters of the Request URL, within the Request Header,[75] or as a Payload within the request. The specific Pixel Events implemented by GazeboTV send Subscribers' PII through the Request URL parameters,[76] HTTP Headers,[77] and for SubscribedButtonClick events, through metadata.

138. Defendants share with Facebook the specific streaming content requested by Subscribers through Request URL parameters. Defendants also share Subscribers' PII in the form of an unencrypted and unique UID contained in the c_user cookie included in the HTTP Request Header, which can be used to find a user's personal Facebook page, as discussed in Section III(A)(2) above. This is portrayed in *Figures 8* through *11*, below.

---

[75] Request Headers are a subset of HTTP Headers that are used to provide information about a request's context, so that a server can customize its response to the request or supply authentication credentials to the server or otherwise provide more information about the client sending the request. *HTTP header*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/HTTP_header (last visited Mar. 26, 2025).

[76] URL parameters are values that are added to a URL to cause a web server to provide additional or different services. *What is a URL?,* MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Mar. 26, 2025).

[77] An "HTTP Header" is a field of an HTTP request or response that passes additional context and metadata about the request or response. *HTTP header*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/HTTP_header (last visited Mar. 26, 2025).




*Figure 8 - Sample video webpage on the Website*




*Figure 9 - Video Title and UID included in URL parameters disclosed to Facebook through PageView Pixel Event on the Website*




*Figure 10 – Video Title included in URL parameters disclosed to Facebook through SubscribedButtonClick Pixel Event on the Website*




*Figure 11 - Video Title and UID included in URL parameters disclosed to Facebook through InitiateCheckout Pixel Event on the Website*

139. As shown in *Figures 9* through *11*, these triggered Pixel Events sent Subscribers' PII to Facebook within the parameters of the Request URL, the Request Header, and as metadata within the Payload of the request.

140. Defendants also transmitted Subscribers' PII in the form of an unencrypted and unique UID contained in the c_user cookie included in the HTTP Request Header, as depicted above.

### *4. Pixel Shares Subscribers' Search Terms*

141. In addition to capturing and sharing Subscribers' video watching history (in violation of the VPPA) and irrespective of how the Subscriber reached the web watching page, the Pixel also intercepted and shared search terms entered by Plaintiff.

142. The search terms often include the title or description of the video being watched or purchased by the Subscriber.

143. After communicating the search terms to the Website, the Website sends the search results back to Subscribers, causing their browsers to load the search results webpage, including searches for a particular video, automatically triggering a PageView Pixel event the moment the search results page loads. This PageView event immediately collects and transmits the Subscriber's PII and web browsing activity to Facebook.

144. For example, a search for "Wind behind my back" on the Website is depicted in *Figures 12* and *13*, below.




*Figure 12 – Sample search for "Wind behind my back" on the Website*




*Figure 13 – Search terms included and disclosed to Facebook through PageView Event*

145. Such search terms, while independently confidential, may also include the capturing and sharing of searches associated with Subscribers' video watching history, resulting in violation of the VPPA.

146. The Pixel appears on the Website, as implemented by the Defendants.

147. When a Subscriber or site visitor types and submits search terms into the search bar of the Website, those search terms are intercepted and monetized by Facebook.

148. Plaintiff was unaware of the Pixel's intercepting their confidential communications with the Website.

149. Plaintiff reasonably believed that communications to the Website were made in confidence.

150. With no notice or warning as to who was intercepting and decoding the contents of their communications, Plaintiff was not provided notice of or given an opportunity to provide consent to the Pixel's interceptions of Plaintiff's search terms.

### *5. Defendants Were Told The Pixel Discloses Subscribers' Data; They Knew Precisely What the Pixel Would Collect and Share*

151. When a business applies with Facebook to use the Pixel, it is provided with detail about its functionality (site policy) including PII.78

152. To make use of the Pixel, Defendants agreed to Facebook's Business Tool Terms (the "Business Terms").

---

[78] *See Get Started*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 14, 2025) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

153. The Business Terms informs website owners using Facebook's tracking tools that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information ("Event Data") and contact information ("Contact Information").79

154. The Business Terms are transparent that Meta will use the Event Data and Contact Information will be processed "solely to match the Contact Information against user IDs ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."80

155. Facebook directs parties implementing the Pixel – here, GazeboTV – to encrypt request information[81] *before* data can be shared.[82]

156. Facebook further provides Pixel users, such as GazeboTV, guidance on responsible data handling, and details how data is acquired, used, and stored, including which information is shared with Facebook.

157. The Business Terms specifically require Pixel users to represent and warrant that they wil not share data that includes "sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[83]

158. Facebook educates or reminds Pixel users of their responsibility to inform their subscribers of their website's data sharing, and specifically guides

---

[79] *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan. 14, 2025).

[80] *Id.*

[81] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. GazeboTV has specifically chosen the Pixel method which makes users' information visible. *See id.*

[82] *Id.*

[83] *Id.*

website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[84]

159. As a sophisticated party entering into a business arrangement with another sophisticated party, GazeboTV was on notice of the potential privacy violations that would result from use of the Pixel, and ignored Facebook's warnings to safely handle its Subscribers' data and to warn its Subscribers that the Website would disclose information in a manner that threatened Subscribers' VPPA-protected PII.

**B. The Google Tracking Tools**

160. Google has an array of advertising products, each serving a specific function in advertising portfolios.

***1. Google Ads***

161. One product, Google Ads (formerly AdWords), is an advertising platform developed by Google, that allows advertisers to place bids to display advertisements, service offerings, product listings, or videos to web users.[85]

162. The process advertisers using Google Ads to display ads within text-based search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[86] (iii) Google then allows advertisers to bid on those various keywords;[87] (iv) the

---

[84] *Best practices for privacy and data use for Meta Business Tools*, FACEBOOK, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Jan. 14, 2025).

[85] *Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Jan. 14, 2025).

[86] *Reach the right people with Search ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited Jan. 14, 2025).

[87] *Id.*

advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

163. Google AdSense, works in conjunction with the Google Ads bidding system, allowing website owners to show Google Ads on websites and earn a revenue share from each ad each time it is viewed or clicked on their own sites.[88] The search terms that various entities bid for through Google Ads are then used by websites owners using Google AdSense to allow website owners to share in the profit Google generates from the advertising.

164. AdSense for content or AdSense for search are methods by which AdSense functions.[89] In either case, AdSense allows the website host to match ads to the website users based on the website's content and visitors.

165. Google Ads intercepted Plaintiff's search terms, as depicted, below, using the sample search "Wind behind my back."

[88] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited Jan. 14, 2025).

[89] *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan. 14, 2025).




*Figure 14 – Test search made on the Website resulted in sharing Search Terms with Google Page Ads*

166. Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

167. Through Google AdSense, Google derives benefits from the ability to aggregate the search data it collects from website users to improve its own services and provide more relevant search results. By understanding patterns and trends in user behavior, Google better understands and gains unencumbered insight into what users are searching for and what they are interested in, which helps Google improve its own services, develop new products, and increase revenues overall.

168. Google's collection and analysis of search results also allows it to improve its machine learning algorithms.[90] Google uses data on how users interact with search results to train its algorithms to provide more accurate and relevant

[90] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Mar. 26, 2025).

search results.[91] For example, if a user clicks on a particular search result and spends more time on that page, Google learns that this page is likely more relevant to that search query. By gathering this vast array of data on all users, Google can build an advertising portfolio for each user which includes their gender, age, job industry, and interests.[92]

169. Google profits in several ways from the Website's use of the Google search engine: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense search, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user search data allows them to further tailor their own products to advertisers and users alike by training its algorithms with vast amounts of search data.

### ***2. Google Analytics***

170. Like the Facebook Pixel, Google Analytics ("GA") collects data about user interactions with a website, including: link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[93]

171. The data collected through GA is sent back to Google, which associates the activity with the website it was collected from.[94] Notably, Google notifies web developers that developers should provide "users with clear and

---

[91] *Id.*

[92] *Id.*

[93] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Mar. 26, 2025).

[94] *About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Mar. 26, 2025).

comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[95]

172. In short, the use of GA represents specific data collection practices and settings and pre-determined destinations for that data. Google itself is aware of the potential legal violations its data collection tools are capable of, and puts the onus of warning users onto the website developers, such as Defendants.

173. Here, Defendants added GA to their Website, which resulted in the interception by and redirection of Plaintiff's search terms to Google, as depicted from the example taken directly from the Website below.




*Figure 15 – Test search made on the Website resulted in sharing search terms with Google Analytics*

174. After arriving at those common destinations, the Google products provide analysis and feedback which help Defendants monetize the collected information through targeted advertising.

[95] *Id.*

### IV. The Website Lacks Informed, Written Consent Pursuant to the VPPA

175. The Website does not seek nor obtain permission from Subscribers, including Plaintiff and the Class, to share Subscribers' PII or web watching history with third parties, including Facebook.

176. The sign-up process for GazeboTV does not seek or obtain informed, written consent.

177. To the extent information about any of the Website's data sharing can be located, the language is not (i) presented to Subscribers of the site in a transparent manner, or where it must be viewed by visitors to the Website; (ii) made available as part of the sign-up process; (iii) offered to Subscribers as checkbox or e-signature field, or as any form of consent; and (iv) presented in terms that sufficiently warn Subscribers that their information, protected by the VPPA, will be shared with a third party.

### V. Plaintiff Did Not Consent to Defendants' Sharing of Plaintiff's Search Terms

178. Plaintiff was unaware of the Pixel's, and other Tracking Tools', interception of their confidential communications with the Website. The absent Class and Subclass Members were equally unaware of the Tracking Tools intercepting their confidential communications with the Website.

179. Plaintiff reasonably believed that communications to the Website were made in confidence. Absent Class and Subclass Members held the same expectation in connection with their own communications between themselves and the Website.

180. With no notice or warning as to who was intercepting and decoding the contents of their communications, Plaintiff was not provided notice of or given an opportunity to provide consent to the Tracking Tools' interceptions of Plaintiff's search terms.

181. Meta and Google, by way of example, guide and caution website operators of the dangers of using their tracking tools without first providing notice of and then obtaining valid consent for invasively collecting consumers' protected data and either making that data available to third-parties or allowing third parties to intercept consumers' protected information. Defendants agreed to these terms, in order to utilize and employ the Tracking Tools.

182. In contravention to Meta's and Google's terms and guidance, Plaintiff was not given notice of the use of the Tracking Tools on the Website.

183. As a result, Plaintiff did not and could not provide consent to the collection and sharing of their data when visiting the Website, running searches on the Website, and requesting videos from the Website.

## VI. <u>Plaintiff Has a Privacy Right in their Search Terms</u>

184. As Senator Leahy aptly foresaw, the time has come where companies can easily build profiles of customers based on their consumer habits.

185. Communications shared between consumers and companies appear to be private but, in reality, the contents of those messages are regularly shared.

186. Here, Defendants share consumers' information, including search terms, with the Tracking Entities.

187. Search terms are inherently private. This is particularly true when the searches are communicated in confidence, or presumed to be private. All search terms are personal in nature, but there is an obviously heightened want for the searches to be kept confidential when the search terms themselves contain private information.

188. As described in Section I(A), descriptions and summaries of requested pre-recorded audio visual materials are private information worthy of federal protection.

189. Subscribers search for video materials on the Website using search terms. The search terms, when associated with descriptions or summaries of the pre-recorded videos, pertain to more than Subscribers' basic privacy.

190. Courts have recognized that users have a reasonable expectation of privacy in URLs that disclose unique search terms or the particular document within a website that a person views.[96]

191. As demonstrated in Section IV, Users' private information is shared through detailed URLs with various third parties, including the Tracking Entities.

[96] *Heerde v. Learfield Commc'ns, LLC*, No. 2:23-CV-04493-FLA (MAAX), 2024 WL 3573874 (C.D. Cal. July 19, 2024) (citing *Brown v. Google LLC*, 685 F.Supp.3d 909, 941 (N.D. Cal. 2023)).

**INJUNCTIVE RELIEF OF DEFENDANTS' ONGOING VPPA AND WIRETAP VIOLATIONS**

192. An actual and immediate controversy has arisen and now exists between Plaintiff and the putative classes he seeks to represent, and Defendants, which parties have a genuine and opposing interest in and which their interests are direct and substantial. Defendants have violated, and continues to violate, Plaintiff's and Class Members' rights to protect their Sensitive Information under the VPPA and the Wiretap Act.

193. Plaintiff has demonstrated that he is likely to succeed on the merits of their claims, and is thus entitled to declaratory and injunctive relief.

194. Plaintiff has no adequate remedy at law to stop the continuing violations of the VPPA and Wiretap Act by Defendants. Unless enjoined by the Court, Defendants will continue to infringe on the privacy rights of Plaintiff, Class Members, and the absent Class Members, and will continue to cause, or allow to be caused, irreparable harm to Plaintiff and Class Members. Injunctive relief is in the public interest to protect the Sensitive Information of Plaintiff and Class Members, and other consumers that would be irreparably harmed through continued disclosure of their Sensitive Information.

195. GazeboTV completely disregards their obligation under the VPPA and Wiretap Act by loading the Tracking Tools onto the Website and facilitating the sharing of Subscribers' Sensitive Information with third parties for any ordinary person to access and use.

196. Despite brazenly violating the VPPA and the Wiretap Act, Subscribers were provided with no notice of the employment of the Tracking Tools and no indication of how or how much of their information was shared with third parties. Worse, in further violation of the VPPA and the Wiretap Act, Defendants did not

seek or obtain any form of consent from Subscribers for the use of the Tracking Tools to share information improperly pulled from the Website.

197. This threat of injury to Plaintiff and members of the Class from the continuous violations requires temporary, preliminary, and permanent injunctive relief to ensure their Sensitive Information is protected from future disclosure.

## TOLLING

198. The statutes of limitations applicable to Plaintiff's and the Classes' claims were tolled by Defendants' conduct and Plaintiff's and Class and Subclass Members' delayed discovery of their claims.

199. As alleged above, Plaintiff and members of the Classes did not know and could not have known when they used the Website that the Tracking Tools were disclosing their information and communications to third parties. Plaintiff and members of the Classes could not have discovered Defendants' unlawful conduct with reasonable diligence.

200. Defendants secretly incorporated the Tracking Tools into the Website, providing no indication to Subscribers that their communications would be disclosed to these third parties.

201. Defendants had exclusive and superior knowledge that the Tracking Entities' Tracking Tools incorporated on their Website would disclose Subscribers' protected and private information and confidential communications, yet failed to disclose to Subscribers that by interacting with the Website, Plaintiff's and Class and Subclass Members' PII would be disclosed to third parties.

202. Plaintiff and members of the Classes could not with due diligence have discovered the full scope of Defendants' conduct because the incorporation of the Tracking Entities' Tracking Tools is highly technical and there were no disclosures or other indication that would inform a reasonable consumer or Website Subscriber

that Defendants were disclosing and allowing the interception of such information to these third parties.

203. The earliest Plaintiff and Class and Subclass Members could have known about Defendants' conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

204. Plaintiff brings this action individually and on behalf of the following Classes:

> **Nationwide Class**: All persons in the United States with a subscription to the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "Class").
>
> **California Subclass**: All persons in California with a subscription to the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "California Subclass").

205. Specifically excluded from the Classes are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

206. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

207. This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

208. Numerosity (Rule 23(a)(1)): At this time, Plaintiff does not know the exact number of members of the aforementioned Classes. However, given the popularity of Defendants' Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

209. Typicality of Claims (Rule 23(a)(3)): Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, subscribed to, and used, the Website to watch videos, and had his Sensitive Information collected and disclosed by Defendants.

210. Adequacy of Representation (Rule 23(a)(4)): Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has no interests antagonistic to, nor in conflict with, the Classes. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

211. Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Subclass Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class and Subclass Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

212. Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

a. Whether Defendants collected Plaintiff's and the Class's Sensitive Information;

b. Whether Defendants unlawfully disclosed and continue to disclose the Sensitive Information of Subscribers of the Website in violation of the VPPA, the Federal Wiretap Act, and CIPA;

c. Whether Defendants' disclosures were committed knowingly; and

d. Whether Defendants disclosed Plaintiff's and the Classes' Sensitive Information without consent.

213. Information concerning Defendants' Website's data sharing practices and subscription members is available from Defendants' or third-party records.

214. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

215. The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

216. Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

217. Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

## COUNT I

### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq*.
### (On Behalf of Plaintiff and the Nationwide Class)

218. Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

219. Plaintiff brings this count on behalf of himself and all members of the Class.

220. The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

221. The VPPA also prohibits direct marketers from using disclosed titles and descriptions of videos to market goods and services directly to consumers. 18 U.S.C. § 2710(b)(2)(D)(ii).

222. "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

223. A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

224. Defendants violated this statute by knowingly disclosing Plaintiff's and other Class Members' personally identifiable information to Facebook.

225. Defendants, through the Website, engage in the business of selling and/or delivering video content to Subscribers, including Plaintiff and the other Class Members, and other users. The Website sells and/or delivers videos to Subscribers, including Plaintiff and the other Class Members, by transmitting the content of the videos from its servers to Plaintiff's and Class Members' devices.

226. Defendants are each a "video tape service provider" because they curate, host, provide access to, sell, and deliver thousands of videos on the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

227. Defendants solicit individuals to pay to and/or subscribe to the Website.

228. Plaintiff and members of the Class are "consumers" because they subscribe to (by creating an account and/or signing up for newsletters with their email address) and/or made purchases on Defendants' Website. 18 U.S.C. § 2710(a)(1).

229. Plaintiff and members of the Class viewed videos on the Website.

230. Defendants disclosed Plaintiff's and Class Members' personally identifiable information to Facebook. Defendants utilized the Pixel which forced Plaintiff's web browser to transmit Plaintiff's identifying information, like their Facebook ID, along with Plaintiff's and Class Members' event data, including the title of the videos they viewed, to Facebook.

231. Defendants knowingly disclosed Plaintiff's and Class Members' PII, which is triggered automatically through Defendants' use of the Pixel. No additional steps on the part of the Defendants, Facebook, or any third-party are required. Once the Pixel's routine exchange of information is complete, the UID

that becomes available can be used by any individual to easily identify a Facebook user. *See* Section III(A)(2) (process to identify individual using UID).

232. Plaintiff and members of the Class did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to Facebook. Defendants failed to obtain "informed, written consent" from Subscribers – including Plaintiff and members of the Class – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

233. Defendants' disclosures of Plaintiff's and Class Members' PII were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2). Instead, Plaintiff's and Class Members' PII was used for improving marketing effectiveness.

234. In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendants failed to provide an opportunity to opt out as required by the VPPA.

235. On behalf of themselves and the Class, Plaintiff seeks: (i) declaratory relief as to Defendants; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of

$2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**COUNT II**

**VIOLATION OF THE FEDERAL WIRETAP ACT**
**18 U.S.C. § 2510, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

236. Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth in all preceding paragraphs of this Complaint.

237. Codified under 18 U.S.C. § 2510 *et seq.*, the Federal Wiretap Act prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

238. The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

239. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

240. The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

241. The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

242. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or

photo optical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

243. Defendants are each a person for the purposes of the Wiretap Act.

244. Plaintiff is a person for the purposes of the Wiretap Act.

245. The Pixel, other Tracking Tools, Defendants' servers, and Plaintiff's and Class Members' PCs constitute a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

246. The confidential communications Plaintiff had with the Website, in the form of their Sensitive Information, were intercepted by the tracking entities and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

247. Plaintiff had a reasonable expectation of privacy in their electronic communications with the Website in the form of their search terms submitted to the Website and browsing information. Even if Plaintiff would not have had a reasonable expectation of privacy in the electronic communications normally, Plaintiff's electronic communications with the Websites included titles, descriptions, and summaries of the films and/or videos he watched, searched for, requested, or subscribed to unlock access to, along with his identifying information, giving rise to a reasonable expectation of privacy pursuant to the VPPA.

248. Plaintiff reasonably expected that third parties were not intercepting, recording, or disclosing their electronic communications with the Website.

249. Within the relevant time period, the electronic communications between Plaintiff and the Website were intercepted by the Tracking Tools the instant they were sent to the Website, without consent, and for the unlawful and wrongful purpose of monetizing his PII, which includes the purpose of using such private information to develop advertising and marketing strategies.

250. Interception of Plaintiff's confidential communications with the Website occur whenever a user uses the search bar within the Website, clicks on any button to access video content, and when navigating various webpages of the Website, including those containing videos.

251. At all times relevant to this Complaint, Defendants' conduct was knowing, willful, and intentional, as Defendants are sophisticated parties with full knowledge regarding the functionality of the Tracking Tools including that allowing the Tracking Tools to be implemented on the Website would cause the private communications of their Subscribers to be shared with the Tracking Entities.

252. Plaintiff was never asked for their consent to expose their confidential electronic communications with Website to third parties. Indeed, such consent could not have been given as Defendants never sought any form of consent from Plaintiff to intercept, record, and disclose his private communications with the Website.

253. Defendants did not consent to expose Plaintiff's confidential electronic communications because any consent provided by Defendants would be constrained by their agreement to Meta's Business Tools Terms, which explicitly disallow the use of the Pixel for violating VPPA rights.

254. As detailed above, the Tracking Entities' unauthorized interception, disclosure and use of Plaintiff's confidential communications were only possible through Defendants' knowing, willful, or intentional placement of the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

255. Plaintiff has been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such Plaintiff is entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by the tracking entities as a result of the violation, or

(b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred.

## **COUNT III**

## INTRUSION UPON SECLUSION
**(On Behalf of Plaintiff and the Nationwide Class)**

256. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

257. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against GazeboTV.

258. GazeboTV intentionally intruded upon Class Members' solitude or seclusion in that it effectively placed the Tracking Entities in the middle of conversations including Sensitive Information to which it was not an authorized party.

259. GazeboTV's participation in the Tracking Entities' tracking and interception of Sensitive Information were not authorized by Plaintiff or Class Members.

260. GazeboTV's enabling of the Tracking Entities' intentional intrusion into Plaintiff's and Class Members' internet communications including Sensitive Information was highly offensive to a reasonable person in that they violated federal and state criminal and civil laws designed to protect individuals' privacy and against theft.

261. Secret monitoring of Sensitive Information is highly offensive behavior.

262. Wiretapping and the surreptitious recording of communications including PII is highly offensive behavior.

263. Public polling on internet tracking has consistently revealed that the overwhelming majority of Americans believe it is important or very important to

be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]." The desire to control one's information is only heightened while a person is handling PII. Plaintiff and Class Members have been damaged by GazeboTV's facilitation of Tracking Entities' intrusion upon their seclusion and are entitled to reasonable compensation including but not limited to disgorgement of profits related to the unlawful internet tracking.

## COUNT IV

### VIOLATION OF THE CALIFORNIA'S INVASION OF PRIVACY ACT
### Cal. Penal Code § 631
### (On Behalf of Plaintiff and the California Subclass)

264. Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

265. Plaintiff brings this count on behalf of himself and all members of the California Subclass.

266. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with

any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

267. The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

268. The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

269. Within the relevant time period, Plaintiff and members of the California Subclass communicated browsing history to Defendants, with the expectation of receiving video content provided by Defendants.

270. Within the relevant time period, Defendants, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and the California Subclass Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

271. The information collected by the Tracking Tools was not for the sole benefit of Defendants.

272. Within the relevant time period, Defendants aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

273. Within the relevant time period, Defendants aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

274. Plaintiff and members of the California Subclass did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

275. The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

**COUNT VI**

**VIOLATION OF THE CALIFORNIA'S INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638**
**(On Behalf of Plaintiff and the California Subclass)**

276. Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

277. Plaintiff brings this count on behalf of himself and all members of the California Subclass.

278. Under CIPA Section 638, a person "may not install or use a pen register or a trap and trace device without first obtaining a court order . . . ." Cal. Penal Code § 638.51.

279. "Trap and trace device" means "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of the communication." *Id.* § 638.50(c).

280. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

281. Defendants' Tracking Tools constitute trap and trace devices because they are devices or processes that captures incoming electronic or other impulses

that identify addressing or signaling information—Plaintiff's and California Subclass Members' Sensitive Information—from the electronic communications transmitted by their PCs.

282. Defendants were not authorized by any court order to use a trap and trace device to track Plaintiff's and California Subclass Members' Sensitive Information.

283. As a direct and proximate result of Defendants' conduct, Plaintiff's and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Classes and their counsel as Class Counsel;

(b) For an order declaring the Defendants' conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d) Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to requiring Defendants to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Subscribers;

(e) For damages in amounts to be determined by the Court and/or jury;

(f) An award of statutory damages or penalties to the extent available;

(g) For Defendants to pay $2,500.00 to Plaintiff and members of the Classes, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h) For pre-judgment interest on all amounts awarded;

(i) For an order of restitution and all other forms of monetary relief;

(j) An award of all reasonable attorneys' fees and costs; and

(k) Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: October 21, 2025

**LEVI & KORSINSKY, LLP**
By: *Adam M. Apton*
Adam M. Apton (State Bar No. 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Telephone: 415-373-1671
Facsimile: 212-363-7171
Email: aapton@zlk.com

*Counsel for Plaintiffs*

*[Additional Counsel listed on signature page]*

Mark S. Reich*
Christopher DeVivo*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cdevivo@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming